# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

JOHNNY MILES, as Surviving
Parent of Abdul Jabar Furcron,
Individually, and as Personal
Representative of the Estate
of Abdul Jabar Furcron,
Deceased,

    Plaintiff,

    v.

CITY OF HAZLEHURST, a
municipality organized under
the laws of the State of
Georgia; OFFICER PHILLIP
BENNETT, Individually and in
his official capacity as a
Hazlehurst Police Officer; and
OFFICER JOSE GAULDALUPE
ZAMORA, Individually and in
his official capacity as a
Hazlehurst Police Officer,

    Defendants.

2:22-CV-30

## ORDER

Before the Court is a motion for summary judgment filed by Defendants City of Hazlehurst ("the City"), Phillip Bennett, and Jose Zamora, dkt. no. 65, as well as a motion for summary judgment filed by Jose Zamora in his individual capacity, dkt. no. 57. The motions have been briefed and are ripe for review. Dkt. Nos. 57, 65, 74, 75, 76, 77, 84, 85. For the reasons stated below, Defendants' motion, dkt. no. 65, is **GRANTED in part and DENIED in**

**part**, and Defendant Zamora's motion, dkt. no. 57, is **DENIED**.

BACKGROUND

The facts of this case begin with a traffic stop for a broken brake light. They end with the death of the driver, Plaintiff Johnny Miles's son, Abdul Jabar Furcron ("Decedent"). Dkt. No. 1-1. What happened in between is, in material parts, disputed.

Plaintiff brought this action alleging violations of Mr. Furcron's constitutional rights, namely his Fourteenth Amendment substantive due process rights, against Defendants Bennett and Zamora, two City of Hazlehurst police officers. Id. Plaintiff also brings state-law negligence claims under a theory of vicarious liability against Defendant City of Hazlehurst. Id.

## I.  The Traffic Stop

This action arises from a traffic stop for a broken brake light. Id. ¶¶ 41–43. On February 11, 2020, Defendant Officer Bennett pulled over Decedent because his car's driver-side brake light was not working. Id. When Officer Bennett initiated this traffic stop, Defendant Officer Zamora arrived to assist. Id. At this point, both officers activated their body-worn cameras ("body cameras"), which captured Defendants' interactions with Decedent. Dkt. No. 58.

Officer Bennett began his encounter with Decedent by explaining that he had stopped Decedent because his brake light was out. See Bennett's Body Camera Video of Traffic Stop, Dkt. No.

58-1 at 00:01-00:20. Decedent told the officers that he knew the brake light was broken and had been trying to fix it. Id. at 00:18-00:45. Decedent also gave Officer Bennett his license and registration, which Officer Bennett brought back to his patrol car to check. Id. at 00:45-02:38. The license and registration were both valid, and Decedent had no outstanding warrants. Dkt. No. 76-3 at 68:9-14. While Officer Bennett checked Decedent's information, Officer Zamora stood at the passenger side window of Decedent's car and engaged in small talk. See Zamora's Body Camera Video of Traffic Stop, Dkt. No. 58-3 at 00:01-01:50. Officer Bennett returned and told Decedent that he appeared nervous. Dkt. No. 58-1 at 02:35-02:45. Officer Bennett also said that he noticed Decedent reach into his pants when the officer first came up to the window. Id. at 02:40-02:47. Decedent responded that he was trying to get his wallet and pocket knife out of his pockets. Id. at 02:45-02:59. Officer Bennett and Decedent then spoke about where Decedent was driving that night. Id. at 03:00-03:43. During this portion of Officer Bennett's body camera video, Decedent's hands are visible, and he does not reach for any object in his pockets. Id. Officer Zamora's body camera footage shows this as well. Dkt. No. 58-3 at 01:55-03:06.

As Decedent explained his driving route that night, Officer Bennett told him to step out of the car. Dkt. No. 58-1 at 03:43-03:46. Decedent asked why, and Officer Bennett again told Decedent

that he was acting nervous. Id. at 03:46-03:57. Decedent did not get out of the car but told Officer Bennett that he was going to call his father. Id. at 03:55-04:00. When Decedent refused to get out of the car and started looking through his phone, Officer Zamora made a hand gesture of a finger gun[1] to Officer Bennett. Id. at 04:05-04:10. Officer Bennett again ordered Decedent to step out of the car multiple times, but Decedent remained inside. Id. at 04:10-04:20. Officer Zamora asked if Decedent had a pistol in his right pocket, and Decedent denied this and said there was nothing in his pocket. Dkt. No. 58-3 at 03:40-03:46. Officer Zamora also told Decedent to step out of the car, saying "I see what I see right here in your right pocket." Id. at 03:45-03:56. Decedent ignored this order as well. Id. In Officer Zamora's body camera footage, possibly in response to Officer Zamora's comment, Decedent appears to reach for his right pocket, but Decedent's exact movements are open to interpretation and slightly blurred because of a glare in the video. Id. at 03:55-04:04. Officer Bennett's body camera did not capture Decedent's hand movements during this portion of the stop. Dkt. No. 58-1 at 04:30-04:46.[2]

---

[1] Officer Zamora made this gesture by pointing his thumb above his fist, mimicking a gun's hammer, and pointing his index and middle fingers outward, mimicking a gun barrel. Dkt. No. 65-2 at 04:08-04:10.

[2] The Court was unable to locate any footage of a gun being pulled, or of a gun in Decedent's possession for that matter. Whether a small dark spot near Decedent's pocket suggests the presence of a gun and whether the slight movement of Decedent's hand can be

Officer Zamora ordered Decedent to put his hands up and pointed his service weapon at Decedent. Dkt. No. 58-3 at 04:00-04:07. At the same time, Officer Bennett told Decedent to "step out of the car" and began opening Decedent's driver-side door. Dkt. No. 58-1 at 04:40-04:45. Decedent then put the car into gear and drove away. Dkt. No. 58-3 at 04:00-04:10. Officer Zamora immediately radioed that Decedent had driven away and that he had a "1032," meaning a gun. Id. at 04:10-04:14; Dkt. No. 74 at 9. Both Defendant Officers ran back to their cars and gave chase. Dkt. No. 58-1 at 04:45-05:00; Dkt. No. 58-3 at 04:07-04:18.

## II.  The High-Speed Chase

As the chase began, Officer Zamora radioed the dispatch center and told them: "Be advised, subject does have 1032 in his right pocket. He was reaching for it." Dkt. No. 58-3 at 04:40-04:46. The pursuit quickly moved through downtown Hazlehurst and into the surrounding countryside. Id. at 04:40-08:00. Officer Zamora again radioed dispatch, stating that Decedent had a "1032" and "attempted to pull it." Id. at 06:58-07:04. He also said: "Make sure you keep an eye on him, if he tosses out that gun." Id. at 07:26-07:33. Shortly after this, Officer Zamora said they were travelling at speeds of around seventy miles-per-hour. Id. at 08:00-08:15. Decedent's speed then increased to over one hundred miles-per-

_____

understood as attempting to pull it, are factual and credibility determinations best left to the trier of fact.

hour. Id. at 08:52–08:55.

The high-speed chase soon extended beyond the city limits, so the Jeff Davis County Sheriff's Office took over the primary lead while the Defendant Officers dropped back. Dkt. No. 29 at 4. As the Sheriff's Office took over the chase, Officer Zamora radioed: "Just be advised again guys, he does have 1032 in his right pocket." Dkt. No. 58-3 at 11:32–11:39. Another officer warned that this stretch of the road had dangerous curves. Id. at 12:51–12:56. Not long after this, Officer Zamora stopped his car because Decedent had crashed. Id. at 14:39–14:45.

Decedent's car veered off the road and crashed into a tree. Id. at 14:45–15:06. The body camera footage shows Decedent in the car, dead from the crash. Id. at 15:07–15:16. As the Defendant Officers walked away from the wreck, Officer Zamora asked Officer Bennett, "You see him go for his pocket? I [saw] the imprint." Id. at 15:54–16:00. Officer Bennett responded: "Yeah, that's why I opened the door. I was about to get ready to snatch him out." See Bennett's Body Camera Video of Accident Scene, Dkt. No. 58-2 at 01:13–01:20. Officer Bennett then spoke to another officer on the scene, and said: "[Officer Zamora] noticed he had a gun in his pocket . . . he went to go try to pull it . . . I opened the door, and went to get him out of the car. He took off on us when he went to try to pull the gun." Id. at 01:48–02:03. Officer Bennett then told another officer that Decedent "started shoving his hands in

6

his pants" and that Officer Zamora had seen a gun. Id. at 04:05-
04:12.

Soon, Chris Morrison, a senior officer with the Hazlehurst
Police, arrived and questioned the Defendant Officers. Dkt. No.
76-3 at 41, 45. Officer Bennett repeated that Decedent had shoved
his hands in his pants and that Officer Bennett had told Decedent
to take his hands out of his pants. Dkt. No. 58-2 at 07:32-07:42.
Officer Zamora added that he saw the butt of a handgun in
Decedent's right pocket. Id. at 07:45-07:55. Officer Morrison then
asked both Defendant Officers: "What was your forcible felony?"
Id. at 08:24-08:32. Officer Zamora answered: "Him pulling a gun."
Id. at 08:30-08:34. Officer Morrison then asked: "Did he point it
at you? Did he make any threats?" Id. at 08:32-08:36. The Defendant
Officers responded in the negative. Id. Officer Morrison then told
both Defendant Officers that they had violated department policy.
Id. at 08:34-08:38. He added: "You just opened a can of worms.
Over [] what? A taillight out? . . . [H]e ran from you, and now
you've got somebody dead . . . . Know your policy." Id. at 08:43-
09:00. Officer Morrison then walked away to investigate the wreck.
Id. at 09:00-09:05.

After Officer Morrison walked away, Officers Bennett and
Zamora discussed the situation between themselves. Id. at 09:05-
10:15. Officer Bennett told Officer Zamora that he did not see
Decedent pull a pistol. Id. at 09:37-09:42. Officer Zamora

7

responded: "He put his hand in his pocket on a pistol like he was going to pull it out." Id. at 09:41–09:46. Officer Bennett then appears to state that he actually saw a pistol. Id. at 09:46–09:55. Later in Officer Bennett's body camera footage, Officer Zamora told another person that Decedent reached for a gun and he believed from "the way [Decedent] grabbed it and looked at [Officer Zamora], he had every intention to use it" but for Officer Zamora having his own gun. Id. at 17:53–18:05. After this, Officer Bennett again repeated that Decedent had his hands shoved in his pants and that Bennett told Decedent to remove his hands. Id. at 21:30–21:37. Law enforcement never located a gun on Decedent, in his car, or anywhere along the chase route. Dkt. No. 76 at 11.

Both Defendant Officers were later deposed about this incident. During Officer Bennett's deposition, he acknowledged that Decedent's hands were visible the entire time Officer Bennett was at the driver-side window of the car. Dkt. No. 76-3 at 42:14–16. He also acknowledged that he never actually saw a gun but believed that he saw a bulge in Decedent's right pocket. Id. at 97:20–25, 58–59. Officer Zamora again said that he saw the butt of a gun sticking out of Decedent's right pocket and that Decedent reached for the gun. Dkt. No. 74-4 at 90:12–13, 92:6–7. Specifically, Officer Zamora testified that Decedent "made a substantial step to reach for the firearm and place his hand on it." Id. at 92:16–17.

8

III.   **The City of Hazlehurst Police Department's Chase Policies**

The Hazlehurst Police Department had multiple rules regulating high-speed chases in effect at the time of this incident. Dkt. No. 74-5. General Order 902.00 provides:

> The Department recognizes that police pursuits are inherently dangerous and pose risks to the safety of citizens and the officers involved in them. The apprehension of a suspect or violator in a pursuit is secondary to the risk of injury or death to citizens or officers. Vehicular pursuits are prohibited unless there is probable cause to believe that the person(s) being pursued have committed or are committing the following:
>
> - Murder, armed robbery, rape, kidnapping, and aggravated battery; or
>
> - Any action that creates an immediate threat of death or serious bodily injury to another or a substantial threat to the safety of another person.

Id. at 2. General Order 902.03 also requires officers to end a pursuit if "the prospect of losing the violator will not balance with the hazards to the officer and to the public," the "[d]istance between the pursuer and pursued continues to lengthen," "[a]dditional information obtained [] would allow for a later apprehension of the violator," or "a superior officer directs to terminate the pursuit." Id. at 3. Although Officer Chris Morrison told Defendant Officers they had violated these policies, there is no evidence in the record of a formal finding by the Hazlehurst Police that either Defendant Officer violated General Order 902.

9

**IV.   Plaintiff's Pending Claims Against Defendants**

In the complaint, Plaintiff asserts eight total claims against Defendants.  In ruling on Defendants' motions to dismiss, however, the Court dismissed five of Plaintiff's claims. <u>See generally</u> Dkt. No. 29. Plaintiff's three remaining claims are:

- Count I: a 42 U.S.C. § 1983 claim against Officer Bennett, Officer Zamora, and the City of Hazlehurst for violating Decedent's substantive due process rights, dkt. no. 1-1 ¶¶ 79-93;

- Count V: a Georgia state-law vicarious liability claim against the City of Hazlehurst for the negligent conduct of Officer Bennett, <u>id.</u> ¶¶ 145-60; and

- Count VI: a Georgia state-law vicarious liability claim against the City of Hazlehurst for the negligent conduct of Officer Zamora, <u>id.</u> ¶¶ 161-76.

Defendants now move for summary judgment on these three counts. Dkt. Nos. 57, 65.

## LEGAL AUTHORITY

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in [his] pleadings. Rather, [his] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576–77 (11th Cir. 1990).

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255.

**DISCUSSION**

## I. Applicable Law

### A. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code ("§ 1983") provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. Section 1983 creates a right of action for vindicating federal rights guaranteed by the Constitution and federal statutes. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). It is not a source of substantive rights. Id.

To prevail in a § 1983 claim, a plaintiff must establish that "the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing Flagg Bros. v. Brooks, 436 U.S. 149, 156–57 (1978)).

### B. Qualified Immunity, Generally

Even when a plaintiff can prove the elements of a § 1983 claim, official immunity may nevertheless block recovery of

12

damages. Michael L. Wells, *Absolute Official Immunity in Constitutional Litigation*, 57 GA. L. REV. 919, 922 (2023). Official immunity is divided into two categories: absolute immunity and qualified immunity. Id.; see also Pierson v. Ray, 386 U.S. 547, 555–57 (1967). As law enforcement officials are protected under the doctrine of qualified immunity, Hunter v. Bryant, 502 U.S. 224, 227 (1991), the Court need not address the doctrine of absolute immunity.

Qualified immunity is an affirmative defense. Ledea v. Metro-Dade Cnty. Police Dep't, 681 F. App'x 728, 729 (11th Cir. 2017) (citing Skritch v. Thornton, 280 F.3d 1295, 1306 (11th Cir. 2002)). When successfully invoked, qualified immunity shields from civil liability government officials who perform discretionary functions. Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity allows "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted). It shields "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

"An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within the

scope of his discretionary authority, and the burden then shifts to the plaintiff to show that the official is not entitled to qualified immunity." Ledea, 681 F. App'x at 729 (citing Skop v. City of Atlanta, 485 F.3d 1130, 1136–37 (11th Cir. 2007)). An official acts within the scope of his discretionary authority if he performs a legitimate job-related function through means that were within his power to utilize. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir. 1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority.")).

If the defendant official establishes that his relevant conduct fell within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity does not apply under the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). Under this test, the Court must determine whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."); Beshers   v.

Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (citing Scott v.
Harris, 550 U.S. 372, 377 (2007)). Second, the Court must determine
whether the right allegedly violated was clearly established at
the time of the violation. Hope, 536 U.S. at 739; Saucier, 533
U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer,
11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1)
whether the facts that a plaintiff has alleged or shown make out
a violation of a constitutional right, and (2) if so, whether the
right at issue was clearly established at the time of the
defendant's alleged misconduct." (internal quotation marks
omitted)). The Court may analyze these two prongs in any order.
Pearson v. Callahan, 555 U.S. 223, 242 (2009); Underwood, 11 F.4th
at 1328. Qualified immunity will shield the defendant official
from civil liability if a plaintiff fails either prong of the
analysis. Id.

The "clearly established" prong merits further discussion.
"'Clearly established' means that, at the time of the officer's
conduct, the law was sufficiently clear that every reasonable
official would understand that what he is doing is unlawful."
District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal
quotation marks omitted) (quoting Ashcroft v. al-Kidd, 563 U.S.
731, 741 (2011)). "[E]xisting law must have placed the
constitutionality of the officer's conduct 'beyond debate.'" Id.
In other words, a legal principle must be "settled law" that is

dictated by controlling authority or a robust consensus of cases of persuasive authority. Id. (citing al-Kidd, 563 U.S. at 741–42).

In the Eleventh Circuit, there are three ways to show that a law is clearly established. Edger v. McCabe, 83 F.4th 858, 864 (11th Cir. 2023). They are as follows:

> First, a plaintiff may show that a "materially similar case has already been decided," whose facts are similar enough to give the police notice. See Keating v. City of Miami, 598 F.3d 753, 766 (11th Cir. 2010). Second, he may show that a "broader, clearly established principle should control the novel facts" of his case. Id. This "broader" principle may be derived from "general statements of the law contained within the Constitution, statute, or caselaw." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (alteration adopted) (quoting Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003)). Finally, a plaintiff may show that the officer's conduct "so obviously violates [the] constitution that prior case law is unnecessary." Keating, 598 F.3d at 766 (quoting Mercado, 407 F.3d at 1159).

Id. There is no requirement that a case be directly on point for a right to be clearly established, but the Court must be mindful of the specific context of the case. Rivas-Villegas v. Cortesluna, 595 U.S. 1, 7–8 (2021) (citing White v. Pauly, 580 U.S. 73, 79 (2017)).

"Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alocer v. Mills, 906 F.3d 944, 951

(11th Cir. 2018) (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted)). The Court "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." <u>Id.</u>

When analyzing the complex issues that arise in § 1983 litigation where defendants have asserted qualified immunity defenses at the summary judgment stage, it is critical to reiterate that the Rule 56 standard still governs. If genuine disputes of material fact exist, the Court cannot grant summary judgment. Fed. R. Civ. P. 56. In this case, there is no dispute that Defendant Officers Bennett and Zamora have established they were acting within the scope of their discretionary duties at all relevant times. Therefore, to survive summary judgment, Plaintiff must establish that Defendants are not entitled to qualified immunity. <u>Ledea</u>, 681 F. App'x at 729.

## II.   Plaintiff's   Section   1983   Substantive   Due   Process   Claim   Against   Defendant   Officers   Bennett   and   Zamora   in   their   Individual   Capacity[3]

_____

[3] Plaintiff brings Count I against Officers Bennett and Zamora in their individual and official capacities, and also against the City of Hazlehurst. Dkt. No. 1-1. Plaintiff's claims against Officers Bennett and Zamora in their official capacities are treated as claims against Hazlehurst. See McMillian v. Johnson, 88 F.3d 1573, 1576 n.2 (11th Cir. 1996) ("A suit against a public official in his official capacity is . . . treated as a suit against the local government entity he represents, assuming that the entity receives notice and an opportunity to respond."). Plaintiff's allegation against Hazlehurst is that the City is "vicariously liable . . . for Defendants Bennett and Zamora's violations of [Decedent's] substantive due process rights under the Fourteenth Amendment to the U.S. Constitution." Dkt. No. 1-1 ¶ 88. A well-established rule in § 1983 jurisprudence, however, is that "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Vicarious liability is not a viable theory for § 1983 claims against municipalities. Id. Instead, a local government "will be liable under section 1983 only for acts for which the local government is actually responsible." Marsh v. Butler Cnty., 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc) (citing Turquitt v. Jefferson Cnty., 137 F.3d 1285, 1287 (11th Cir. 1998)). Municipal liability attaches where the local government's custom or policy caused its employee to violate the plaintiff's constitutional rights. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (citations omitted). In this case, Plaintiff brought so-called Monell claims against the City of Hazlehurst, but the Court dismissed those claims. Dkt. No. 1-1 ¶¶ 127–44; Dkt. No. 29 at 40–47. Absent any remaining viable § 1983 claims against the City, it is entitled to summary judgment as to Count I. Officers Bennett and Zamora are also entitled to summary judgment as to Count I on Plaintiff's official capacity claims. Defendants' motions for summary judgment are therefore **GRANTED** as to these claims. The City's motion for summary judgment on Plaintiff's claim for federal punitive damages is also **GRANTED** because municipalities are immune from punitive damages in suits brought under § 1983. Gonzalez v. Lee Cnty. Hous. Auth., 161 F.3d 1290, 1299 n.30 (11th Cir. 1998) (citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)).

**A. Overview**

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has explained that this provision bars "certain government actions regardless of the fairness of the procedures used to implement them." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). An official violates the substantive component of the Due Process Clause when his conduct amounts to deliberate indifference to life and safety and shocks the conscience. Id. at 847; see also United States v. Salerno, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty.'" (citations omitted)). A police officer does not violate "the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." Lewis, 523 U.S. at 836. Rather, "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." Id.; see also White v. Polk Cnty., 207 F. App'x 977,

978 (11th Cir. 2006) ("[T]he critical factor in determining whether the officer violated the Fourteenth Amendment's guarantee of substantive due process was whether the officer's conduct shocked the conscience, which occurs when a plaintiff can show that the officer had 'a purpose to cause harm unrelated to the legitimate object of arrest.'" (quoting Lewis, 523 U.S. at 836)).

Law enforcement officials may be liable under § 1983 for a substantive due process violation if they engage in a high-speed chase with an intent to physically harm a suspect or to worsen a suspect's legal plight. Lewis, 523 U.S. at 854. "[I]n cases in which police officers are required to make quick judgments about the proper course of action and therefore cannot deliberate before acting, even a showing that the officer's recklessness caused the plaintiff's injury is insufficient to support a substantive due process claim." Vaughan v. Cox, 434 F.3d 1323, 1333 (11th Cir. 2003) (citing Lewis, 523 U.S. at 853–54).

**B. Analysis**

To survive summary judgment on his substantive due process claim, Plaintiff must offer evidence that Officers Bennett and Zamora engaged in the high-speed chase of Decedent with an intent to harm him or to worsen his legal plight. See Lewis, 523 U.S. at 854. In short, the Court finds that Plaintiff has submitted sufficient evidence to create a genuine factual dispute about the Defendant Officers' intents to harm or worsen Decedent's legal

20

plight.

**1. Officer Zamora's Conduct**

Resolution of Officer Zamora's motion for summary judgment comes down to whether there is sufficient factual evidence that he lied about Decedent possessing and pulling a gun. Video evidence from the traffic stop contravenes Officer Zamora's statements about Decedent having a gun and pulling it. This conflict in the evidence could allow a jury to determine that Officer Zamora lied.

Officer Zamora's body camera footage shows that Zamora had a clear, well-lit view of Decedent and his car's interior. Dkt. No. 58-3. Officer Zamora's footage does not show that Decedent pulled a pistol or reached into his pocket and grabbed a gun. Id. Yet, Officer Zamora, at times, said the opposite. When the chase began, Officer Zamora said that Decedent had a gun—a "1032"—and "attempted to pull it." Id. at 06:58-07:04. When Officer Morrison arrived at the accident scene and spoke to the Defendant Officers, Officer Zamora said that he saw the butt of a handgun in Decedent's right pocket and that Decedent "pull[ed] a gun." Dkt. No. 58-2 at 07:45-07:55, 08:30-08:34. When Officer Zamora spoke to Officer Bennett, Zamora said that Decedent "put his hand in his pocket on a pistol like he was going to pull it out." Id. at 09:41-09:46. When Officer Zamora spoke to another officer, he said "the way [Decedent] grabbed [the gun] and looked at me, he had every intention to use it." Id. at 17:53-18:05.

A reasonable jury could conclude that each of these statements were lies or fabrications. Officer Zamora's body camera footage does show that Decedent appeared to have something in his right pocket. Dkt. No. 58-3 at 03:08-04:05. The footage also shows Decedent stuck his fingers into his right pocket. Id. The footage does not, however, show the butt of a gun, Decedent's hand on a pistol, or Decedent pulling a gun. Id. Officer Zamora's statements contradict the video evidence. It is possible that a jury might believe that Officer Zamora reasonably believed that he saw the imprint of a gun, the butt of a gun, or that Decedent was about to reach for a gun. Deciding whether Officer Zamora lied or whether Officer Zamora spoke in good faith about seeing a gun will require an assessment of Zamora's credibility, weighing the evidence, and drawing factual inferences once all the evidence is presented. Only a jury can make these determinations. Anderson, 477 U.S. at 255.

**2. Officer Bennett's Conduct**

The parties agree that resolution of Officer Bennett's motion for summary judgment turns on whether a reasonable jury could find that Officer Bennett "knew that Zamora was lying regarding [Decedent's] possession and brandishing of a handgun during the subject traffic stop" and "knowingly adopted and perpetuated this lie to other law enforcement officials." Dkt. No. 65 at 3; see also Dkt. No. 76 at 12-13. Officer Bennett's accounts of the

22

traffic stop and subsequent chase are plagued by inconsistencies. His varying versions raise factual disputes. These inconsistencies could allow a jury to conclude that Officer Bennett knowingly adopted and perpetrated Officer Zamora's alleged lies about Decedent possessing a gun.

In Officer Bennett's body camera footage from the initial traffic stop, Bennett never mentioned seeing a firearm or any object that could be construed as a firearm. Dkt. No. 58-1. Officer Bennett did not see Decedent pull a gun or attempt to pull a gun. Dkt. No. 76-3 at 41–42, 58–59. As Officer Bennett acknowledged in his deposition, Decedent's hands were visible the entire time Officer Bennett was at the driver-side window of the car. Id. at 42:14–16. In Officer Bennett's body camera footage, it is also evident that he had a clear, well-lit view of Decedent's body and the inside of Decedent's car. Dkt. No. 58-1.

Despite on some occasions acknowledging that he did not see a gun or see Decedent possessing a gun, Officer Bennett says the opposite at other times. At the scene of the wreck, Officer Bennett told Officer Zamora that he did not see Decedent pull a gun. Dkt. No. 58-2 at 09:37–09:42. That said, when Officer Zamora said that Decedent "put his hand in his pocket on a pistol," Officer Bennett said, "I looked at his pistol." Id. at 09:37–09:55. This conflicts with what Officer Bennett said at the scene of the wreck and in his deposition. During his deposition, Officer Bennett also said

that he saw a bulge in Decedent's right pocket. Dkt. No. 76-3 at 97:20-25. Puzzlingly, however, Officer Bennett did not mention a bulge during the traffic stop or when he and Officer Zamora spoke to the other officers at the scene of the wreck. Officer Bennett mentioned seeing a bulge and a gun only after Officer Zamora said that Decedent had a gun.

A reasonable jury could find that Officer Bennett knew Officer Zamora was lying about Decedent possessing a gun. Officer Bennett did not see a gun and certainly did not see Decedent pull a gun. See Dkt. No. 58-1. Officer Bennett had the same view of Decedent's hands as Officer Zamora. Id. Officer Zamora claimed Decedent pulled a gun, attempted to pull a gun, or grabbed a pistol in his pocket. Id. In light of the body camera footage and Officer Bennett's deposition testimony, a jury could find that Officer Bennett knew these claims were false.

Determining whether Officer Bennett adopted or perpetuated Officer Zamora's alleged lies about a gun is a matter that must be decided by a jury. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson, 477 U.S. at 255. Determining whether Officer Bennett knowingly adopted and perpetuated Officer Zamora's alleged lies will require sifting through Officer Bennett's inconsistent

24

accounts, weighing Officer Bennett's credibility, and drawing factual inferences. These decisions must be made by a jury and not by the Court.

### 3. A Reasonable Jury Could Find that the Defendant Officers' Conduct Violated Decedent's Substantive Due Process Rights.

Viewing the Officer Defendants' conduct, a jury could conclude that Officers Bennett and Zamora engaged in the high-speed chase of Decedent with an intent to physically harm Decedent or to worsen his legal plight.

Based on the record evidence, a jury could find that Officer Zamora lied about the circumstances of the Defendant Officers' pursuit of Decedent and that Officer Bennett adopted and perpetuated these lies, which could suggest that the Defendant Officers acted with a purpose to harm Decedent. Lying about a suspect possessing a gun and pulling a gun on police officers supports an inference of an intention to harm. See, e.g., Clark v. Merrell, No. 19-1579, 2021 WL 288791, at *5 (E.D. Pa. Jan. 28, 2021) ("[The defendant officer's] repeated attempts to conceal, coverup or simply lie about the circumstances of his unauthorized pursuit of [the suspect] also support an inference that he acted with a purpose to cause harm."); Johnson v. Balt. Police Dep't, 452 F. Supp. 3d 283, 302 (D. Md. 2020) (finding that police officers acted with an intent to harm when they falsified police reports "to provide a *post hoc* justification of their pursuit");

Black v. City of Blue Ash, No. 1:08-CV-584, 2009 WL 799063, at *5,
7 (S.D. Ohio Mar. 23, 2009) (finding that a plaintiff had plausibly
alleged a purpose to cause harm where an officer repeatedly lied
to justify his pursuit).

Based on the record evidence, a jury could also find that the
Defendant Officers lied and perpetuated those lies to provide a
*post hoc* justification for their pursuit, which could show their
intent to harm. The Hazlehurst Police Department's policies
prohibited the Defendant Officers from chasing Decedent unless he
had committed a forcible felony or posed a threat of serious bodily
harm toward others. Dkt. No. 74-5. The Defendant Officers justified
their high-speed chase of Decedent under these policies by stating
that he had pulled a gun on police officers and then fled while in
possession of a gun. A jury could, therefore, find that Officers
Zamora and Bennett repeatedly lied to justify their pursuit of
Decedent. Such behavior would be "so egregious, so outrageous,
that it may fairly be said to shock the contemporary
conscience." Lewis, 523 U.S. at 847 n.8.

Considering the facts, as well as all reasonable inferences
drawn therefrom, it is plausible that Officers Zamora and Bennett
were not driven by their "instinct to do [their] job as [] law
enforcement officer[s]," but instead by "an improper or malicious
motive," such as to "terrorize, [or] cause harm" to Decedent. Id.
at 855. The Defendant Officers' alleged lies further suggest that

their pursuit of Decedent did not have a "legitimate" law enforcement objective. Id. at 836. Instead, a jury could find the evidence suggests that the Defendant Officers repeatedly lied to justify their high-speed chase which caused Decedent to lose his life.

**4. The Law was Clearly Established at the Time of the Alleged Constitutional Violation.**

On February 11, 2020, the date of the incident, a police officer in the Eleventh Circuit would have understood that he could be subjected to constitutional liability for a high-speed pursuit if he acted with an intent to cause harm. Supreme Court precedent dictates this notice. In 1998, the Supreme Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983." Id. at 854. Eleventh Circuit precedent also provides notice on this settled rule. See Vaughan, 343 F.3d at 1333 ("[A] violation of substantive due process will be found only when a plaintiff can show that the officer had 'a purpose to cause harm unrelated to the legitimate object of arrest.'" (quoting Lewis, 523 U.S. at 836)).

Applying the Lewis standard in the specific context of this case raises a level of abstraction issue. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1209 (11th Cir. 2007) ("The operation of

this clearly established standard [for a Fourteenth Amendment due process claim], however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." (alterations adopted) (quoting Anderson, 483 U.S. at 639)); Sauers v. Borough of Nesquehoning, 905 F.3d 711, 716 (3d Cir. 2018) ("Defining a right at the appropriate level of specificity is often the most critical aspect of a qualified immunity analysis."). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." Kisela v. Hughes, 584 U.S. 100, 104 (2018) (internal quotation marks omitted) (citation omitted). Defining the relevant clearly established law at a low level of generality, Defendants' alleged lies and high-speed chase would violate Decedent's substantive due process rights under the Lewis standard.

Lewis establishes "a broader, clearly established principle that should control the novel facts of [this] situation." Echols v. Lawton, 913 F.3d 1313, 1324 (11th Cir. 2019); see also Perez v. City of Sweetwater, No. 16-24267-CIV, 2016 WL 11002555, at *5 (S.D. Fla. Dec. 22, 2016) (denying qualified immunity because "the Supreme Court in Lewis clearly established a police officer's high-speed chase with intent to harm the suspect or worsen a suspect's legal plight gives rise to liability" and "it would have been clear to a reasonable officer that shooting [the suspect] and chasing him during morning rush hour traffic with intent to cause him

28

injury is unlawful"). "[E]very objectively reasonable government official facing the circumstances [of this case] would know that [Officers Bennett and Zamora's] conduct did violate federal law when the official acted." Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002). The Lewis standard articulates an embodiment of "[t]he core of the concept" of due process, which is "protection against arbitrary action." 523 U.S. at 845. Thus, actions that fall squarely within Lewis's prohibition might also "so obviously violate[] the Constitution that prior case law is unnecessary." Echols, 913 F.3d at 1325. This is one of those cases.

While conduct that obviously violates the Constitution comprises a "narrow category" of cases, id., this case presents the rare scenario that fits this category. Here, Officers Bennett and Zamora's alleged actions—falsely claiming that Decedent possessed a gun and pulled the gun on them—would necessitate an inference that they acted with an intent to harm Decedent. Lying about whether a suspect pulled a gun on police officers is the kind of conscience-shocking behavior that "lies so obviously at the very core" of the arbitrary action prohibited by the Fourteenth Amendment substantive due process clause. Lee, 284 F.3d at 1198–99. No reasonable officer could believe that lying about whether a suspect possessed or pulled a gun was a legitimate law enforcement activity. See id. at 1199 (finding a clearly established constitutional violation because "no reasonable

officer could have believed that [the defendant's] actions were legal"). "[A]pplication of the [intent to harm] standard would inevitably lead every reasonable officer in [Officers Bennett and Zamora's] position to conclude" that their actions were unlawful. <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 926–27 (11th Cir. 2000).

Because Plaintiff has presented sufficient evidence to show that a genuine dispute of material fact exists as to whether Defendant Officers Bennett and Zamora violated Decedent's substantive due process rights and has shown that the law was clearly established at the time of the incident, the Court **DENIES** Defendants Bennett and Zamora's motions for summary judgment as to Count I in their individual capacity. Dkt. Nos. 57, 65. As a result, Plaintiff's claims for federal punitive damages against Officers Bennett and Zamora in their individual capacities remain pending.[4]

**III.  Plaintiff's State-Law Vicarious Liability Claims Against the City of Hazlehurst**

**A. Overview**

Plaintiff brings two vicarious liability claims against the City of Hazlehurst pursuant to O.C.G.A. § 36-92-3. Dkt. No. 1-1 ¶¶ 156, 172. Defendant Hazlehurst argues that these claims are

---

[4] Defendants Bennett and Zamora did not move for summary judgment as to Plaintiff's federal punitive damages claim.

barred under the doctrine of sovereign immunity. Dkt. No. 65 at 17. To address these arguments, the Court will first discuss Georgia's doctrine of sovereign immunity and then analyze whether the doctrine bars Plaintiff's claims against the City.

Georgia adopted the common law doctrine of sovereign immunity in 1784.[5] Gilbert v. Richardson, 452 S.E.2d 476, 478 (Ga. 1994) (citations omitted). As later modified in the state constitution, "sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." GA. CONST. art. I, § II, para. IX(e).

Sovereign immunity protects cities from suit under Georgia's constitution. See CSX Transp., Inc., v. City of Garden City, 588 S.E.2d 688, 689-91 (Ga. 2003) (holding that a Georgia city is protected under the doctrine of sovereign immunity); City of Albany

---

[5] In 1784, Georgia adopted the common law of England as it existed on May 14, 1776, as Georgia law. OLIVER H. PRINCE, A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 570 (2d ed. 1837). In 1776, the doctrine of sovereign immunity was imbedded in English common law. 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 235 (Oxford, Clarendon Press 1768) ("[N]o suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him. For all Jurisdiction implies superiority of power."). Georgia, therefore, adopted England's doctrine of sovereign immunity as its own. The 1784 statute remains valid law in Georgia, codified at O.C.G.A. § 1-1-1(c)(1).

v. Stanford, 815 S.E.2d 322, 326 (Ga. Ct. App. 2018) ("Plaintiffs must be able to point to some statutory or constitutional provision waiving the City's sovereign immunity." (citations omitted)). Cities in Georgia are absolutely immune from suit for tort liability unless the General Assembly has specifically waived immunity under the state constitution. Stanford, 815 S.E.2d at 326. Sovereign immunity protects cities from state-law claims even when those claims are brought in federal court. Presnell v. Paulding Cnty., 454 F. App'x 763, 767 (11th Cir. 2011) ("[T]he State of Georgia has not waived its sovereign immunity from suit in federal court.").

Relevant here, the General Assembly has waived cities' sovereign immunity "to the extent of the amount of liability insurance purchased for the negligence of [city employees] arising from the use of a motor vehicle." Gilbert, 452 S.E.2d at 480 (citing O.C.G.A. § 33-24-51). O.C.G.A. § 36-92-3 allows a plaintiff to sue a local government that employs an "officer or employee who commits a tort involving the use of a covered motor vehicle while in the performance of his or her official duties." O.C.G.A. § 36-92-3(a). This code section is an explicit waiver of sovereign immunity for local governments. See O.C.G.A. § 36-92-2(b) ("The sovereign immunity of local government entities for a loss arising out of claims for the negligent use of a covered motor vehicle is waived only to the extent and in the manner provided in this

chapter and only with respect to actions brought in the courts of this state."). More specifically,

> The sovereign immunity of local government entities for a loss arising out of claims for the negligent use of a covered motor vehicle is waived up to . . . $500,000.00 because of bodily injury or death of any one person in any one occurrence, . . . for incidents occurring on or after January 1, 2008.

O.C.G.A. § 36-92-2(a)(3).

### B. Analysis

The City of Hazlehurst argues that O.C.G.A. § 36-92-2 does not apply and that it is immune from Plaintiff's claims because "first, the City is statutorily immune from liability for torts committed by its officers pursuant to O.C.G.A. § 36-33-3; and second, plaintiff has not shown that there is otherwise a waiver of the City's sovereign immunity under state law." Dkt. No. 65 at 17. These arguments fail.

First, O.C.G.A. § 36-33-3 is not a blanket grant of sovereign immunity for all suits involving torts committed by police officers. O.C.G.A. § 36-33-3 provides: "A municipal corporation shall not be liable for the torts of policemen or other officers engaged in the discharge of the duties imposed on them by law." As required by the Georgia Constitution, O.C.G.A. § 36-33-3 is subject to the waiver of sovereign immunity "by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. art. I,

§ II, para. IX(e). O.C.G.A. § 36-24-51(b) is such a waiver. <u>See</u> <u>Ekarika v. City of E. Point</u>, 420 S.E.2d 391, 392 (Ga. Ct. App. 1992) ("Consequently, O.C.G.A. § 36-33-3 is a governmental immunity statute and is subject to the waiver of immunity provision of O.C.G.A. § 33-24-51(b)."). Georgia's General Assembly waived the sovereign immunity of the City of Hazlehurst when it established that "[t]he sovereign immunity of local government entities for a loss arising out of claims for the negligent use of a covered motor vehicle is waived as provided in Code Section 36-92-2." O.C.G.A. § 33-24-51(b). O.C.G.A. § 36-92-2 then provides the extent of this waiver. Further, in case the term "local government officer or employee" as used in the statute is unclear, O.C.G.A. § 36-92-1 defines the term as "[a]n officer, agent, servant, attorney, or employee of a local government entity." O.C.G.A. § 36-92-1(4)(A). So while the City would typically be protected from suit for the actions of Officers Bennett and Zamora under the doctrine of sovereign immunity, Georgia law has expressly waived the City's sovereign immunity when city police officers negligently use a covered motor vehicle, which is exactly what Plaintiff has presented evidence of here.

Second, Plaintiff has shown a waiver of the City's sovereign immunity under state law. In his complaint, Plaintiff correctly raised O.C.G.A. § 36-92-3 as justifying his cause of action against the City. Dkt. No. 1-1 ¶¶ 156, 172. Plaintiff has also shown that

Georgia law waives the City's sovereign immunity. See Dkt. No. 76 at 20-23 (citing O.C.G.A. §§ 36-24-51(b) and 36-92-2).

The City next argues that even if O.C.G.A. §§ 36-92-2 and 36-92-3 waive its sovereign immunity, Plaintiff's claims still fail because Decedent was a fleeing suspect. Dkt. No. 65 at 19. The City contends that Plaintiff's claims are barred by O.C.G.A. § 40-6-6(d)(2), which provides:

> When a law enforcement officer in a law enforcement vehicle is pursuing a fleeing suspect in another vehicle and the fleeing suspect damages any property or injures or kills any person during the pursuit, the law enforcement officer's pursuit shall not be the proximate cause or a contributing proximate cause of the damage, injury, or death caused by the fleeing suspect unless the law enforcement officer acted with reckless disregard for proper law enforcement procedures in the officer's decision to initiate or continue the pursuit. Where such reckless disregard exists, the pursuit may be found to constitute a proximate cause of the damage, injury, or death caused by the fleeing suspect, but the existence of such reckless disregard shall not in and of itself establish causation.

The City claims that pursuant to this statute, "a fleeing suspect cannot avail himself of the waiver of sovereign immunity" and that Plaintiff "has no evidence in the record that this pursuit was initiated or continued in the reckless disregard of proper law enforcement procedures." Dkt. No. 65 at 20. This is not so.

By its plain language, O.C.G.A. § 40-6-6 does not bar a fleeing suspect's claim under the doctrine of sovereign immunity. See O.C.G.A. § 40-6-6(d)(3) ("The provisions of this subsection shall apply only to issues of causation and duty and shall not

35

affect the existence or absence of immunity which shall be determined as otherwise provided by law."). O.C.G.A. § 40-6-6 governs only the substantive elements of a negligence claim. See O.C.G.A. § 40-6-6(d)(2). It does not bar a fleeing suspect or his representative's claims under the doctrine of sovereign immunity.

Plaintiff has also submitted evidence that Officers Bennett and Zamora's pursuit was initiated or continued in reckless disregard of proper law enforcement procedures. Plaintiff has submitted video evidence in which Officer Morrison, a senior officer, told Officers Bennett and Zamora that they violated Hazlehurst Police policies because they lacked a forcible felony to justify the pursuit. Dkt. No. 58-2 at 08:34–08:38. Plaintiff has also submitted evidence suggesting that the Defendant Officers initiated and continued the high-speed chase of Decedent after lying about Decedent possessing and pulling a handgun on the officers. While a jury must determine whether the Defendant Officers lied, such lies would show a reckless disregard for proper law enforcement procedures. Finally, Plaintiff has offered sufficient evidence creating a genuine dispute of material fact as to whether Officers Bennett and Zamora acted with an intent to harm Decedent. Although O.C.G.A. § 40-6-6 limits the liability of officers who injure fleeing suspects, a "fleeing suspect may be able to recover for her own injuries if an officer acts with an actual intent to cause injury." City of Winder v. McDougald, 583

S.E.2d 879, 881 (Ga. 2003) (footnote omitted).

In sum, Plaintiff's claims against the City of Hazlehurst are not barred by the doctrine of sovereign immunity. Additionally, genuine disputes of material fact exist as to whether Officers Bennett and Zamora negligently used their vehicles, whether the officers recklessly disregarded police procedures, and whether the officers acted with an intent to injure or harm Decedent. Should a jury answer these questions in the affirmative, the City would be vicariously liable for the tortious conduct of the Defendant Officers. Defendant City of Hazlehurst's motion for summary judgment, dkt. no. 65, is, therefore, **DENIED**.

As to the City's motion for summary judgment on Plaintiff's claim for punitive damages, however, that motion is **GRANTED**. "[A] municipality cannot be held liable for punitive damages" under Georgia law. City of Columbus v. Myszka, 272 S.E.2d 302, 305 (Ga. 1980) (citations omitted).

### CONCLUSION

The evidence is open to multiple interpretations. The living witnesses have modified portions of their recollections in material ways. The jury is the proper body to interpret and weigh the evidence and to assess credibility. For these reasons, the motion for summary judgment filed by Defendants City, Bennett, and Zamora, dkt. no. 65, is **GRANTED in part and DENIED in part**. The motion is **GRANTED** as to:

37

- Plaintiff's § 1983 substantive due process claim against Officers Bennett and Zamora in their official capacities (Count I);

- Plaintiff's § 1983 substantive due process claim against the City of Hazlehurst (Count I); and

- Plaintiff's claim for punitive damages against the City of Hazlehurst.

These claims are therefore **DISMISSED with prejudice.**

The motion is **DENIED** as to:

- Plaintiff's § 1983 claim against Officer Bennett in his individual capacity (Count I);

- Plaintiff's state-law vicarious liability claim against the City of Hazlehurst for the negligent conduct of Officer Bennett (Count V); and

- Plaintiff's state-law vicarious liability claim against the City of Hazlehurst for the negligent conduct of Officer Zamora (Count VI).

Defendant Zamora's motion for summary judgment, dkt. no. 57, is **DENIED** as to Plaintiff's § 1983 claim against Officer Zamora in his individual capacity (Count I).

Finally, Plaintiff's federal punitive damages claim against Officers Bennett and Zamora in their individual capacities remain pending.

The Parties are **ORDERED** to file a proposed consolidated pretrial order within **twenty (20) days** of the date of this Order.

**SO ORDERED** this 8th day of March, 2024.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA